## Office of Disciplinary Counsel v. Goldman

Disciplinary Board Docket no. 157 D.B. 2003.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

WRIGHT JR., *Member,* May 20, 2005—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On October 14, 2003, Office of Disciplinary Counsel filed a petition for discipline against Howard Goldman, respondent. The petition contained four separate charges of client misconduct. Respondent filed an answer to petition for discipline on November 14, 2003.

A disciplinary hearing was held on April 14, 2004 before Hearing Committee 1.18 comprised of Chair Steven Dickstein, Esquire, and Members Michael R. Stiles, Esquire, and Andrew J. Trevalise, Esquire. Respondent was represented by James C. Schwartzman, Esquire.

Following the submission of briefs by the parties, the Hearing Committee filed a report on January 21, 2005, finding that respondent violated the Rules of Professional Conduct as contained in the petition for discipline, and recommending that respondent be suspended for one year with a practice monitor.

This matter was adjudicated by the Disciplinary Board at the meeting of March 16, 2005.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is located at Suite 1400, 200 North Third Street, Harrisburg, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of said Rules of Disciplinary Enforcement.

(2) Respondent was admitted to practice law in the Commonwealth in 1983. Respondent maintains an office for the practice of law at 42 South 15th Street, Suite 1313, Philadelphia, PA 19102. He is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court of Pennsylvania.

(3) Respondent has no prior history of discipline.

*Charge I: The Lutz Matter*

## A. Fee Agreement

(4) In February 1999, Philip Lutz retained respondent to represent him in custody and support matters against his ex-wife, Nevin Fahmii.

(5) Respondent had not previously represented Mr. Lutz.

(6) Respondent initially told Mr. Lutz that his fee for representation in both matters would be $7,500 and that respondent would start on Mr. Lutz' case immediately.

(7) Respondent received a total of $7,506 from Mr. Lutz to represent him in his child custody and support matters.

(8) Respondent failed to advise Mr. Lutz of the basis or rate of his fee, in writing, before or within a reasonable time after commencing the representation or provide a timetable in which payment had to be made in order for services to be provided. Instead, respondent orally advised Mr. Lutz that this fee was a flat rate, and he would not incur any additional fees.

## B. Child Custody Matter

(9) At the time Mr. Lutz retained respondent, Mr. Lutz:

(a) informed respondent that Ms. Fahmii was engaged in conduct which was harmful to their child, including keeping their son home from school;

(b) told respondent that he wanted him to move as quickly as possible to pursue full custody; and

(c) provided documents to respondent, including his original divorce decree.

(10) Respondent advised Mr. Lutz that, in a case of this nature, he would have to file a request for a protracted hearing. Respondent assured Mr. Lutz that he would move promptly to pursue the custody action.

(11) Mr. Lutz informed respondent that Ms. Fahmii had become pregnant, and that he was concerned that if the custody matter were not resolved promptly, then there would be a sibling who would be considered to the detriment of Mr. Lutz' claims. Respondent told Mr. Lutz not to worry about this issue.

(12) Respondent did not file Mr. Lutz' custody complaint, *Lutz v. Fahmii,* no. OC-99-01598, Court of Common Pleas, Family Court Division, until July 2, 1999.

(13) By order dated July 8, 1999, the Honorable Paul P. Panepinto scheduled Mr. Lutz' custody matter for a conference/hearing before Family Court Division Master Eleanor Flannery, Esquire, on August 30, 1999. Respondent was served with a copy of the order.

(14) On July 22, 1999, in a telephone conversation with Saul Levit, Esquire, counsel for Ms. Fahmii, respondent stated that the custody matter was before a master and that he would check on the procedure to bring the case before a judge as Mr. Lutz was requesting primary custody.

(15) By letter dated August 25, 1999, to Ms. Flannery, respondent:

(a) requested a new listing of the custody matter because he would be out of town on the scheduled date, August 30, 1999; and

(b) stated that he believed the matter would ultimately result in a custody trial before a Family Court Judge.

(16) By letter to Ms. Flannery dated October 15, 1999, respondent:

(a) stated that the custody matter had been continued on August 30, 1999, pursuant to a joint request;

(b) stated that the reason for the August 30, 1999 continuance was because the parties were attempting an amicable resolution of a temporary visitation schedule; and

(c) requested that the master's hearing be rescheduled to preserve Mr. Lutz' rights.

(17) On December 6, 1999, Judge Panepinto entered an order, based on a temporary agreement between the parties, awarding Mr. Lutz partial temporary custody of his son. Respondent received a copy of the order.

(18) By letter dated March 31, 2000, to the Family Court Division, Ms. Fahmii requested a postponement of the custody hearing scheduled for April 6, 2000, because she was ill. By letter to the Honorable Edward B. Rosenberg, dated April 3, 2000, respondent noted no objection to Ms. Fahmii's request for a continuance. On April 6, 2000, Judge Rosenberg granted Ms. Fahmii's continuance to the next available date. By order dated May 1, 2000, Judge Rosenberg rescheduled the custody hearing to June 23, 2000.

(19) By letter to Judge Rosenberg, dated June 7, 2000, respondent requested a protracted hearing in the custody matter.

(20) Judge Rosenberg's office informed respondent that if his client needed a protracted hearing, then respondent must file a formal petition with the court.

(21) By letter to Judge Rosenberg, dated June 12, 2000, respondent:

(a) confirmed that he received Judge Rosenberg's instructions to file a formal petition if he wanted a protracted hearing; and

(b) requested that the custody matter listed for June 23, 2000, be rescheduled pending the determination of that petition;

(c) by order dated June 23, 2000, Judge Rosenberg granted respondent's request for a continuance based on respondent's statement that "he will file a formal petition for a protracted hearing." (Stip. ¶59.) Respondent received the order.

(22) Respondent failed to file a petition for a protracted hearing.

(23) Respondent failed to advise Mr. Lutz that he had not filed the required petition for a protracted hearing.

(24) Respondent told Mr. Lutz that respondent was working on the petition for the protracted hearing when, in fact, he was not working on the petition.

(25) By letter dated August 23, 2000, Mr. Lutz wrote to respondent requesting an emergency order to compel Ms. Fahmii to honor their agreement with respect to education of their son. Respondent advised Mr. Lutz that attending school was not an emergency and that respondent should let the court process take its course.

(26) Thereafter, and continuing until September 2001, when Mr. Lutz discharged respondent, respondent failed to file the petition for a protracted hearing.

(27) As a result of respondent's misconduct, Mr. Lutz lost the opportunity to gain primary custody of his son.

## C. Child Support Matter

(28) On October 27, 1999, Ms. Fahmii filed a complaint for child support against Mr. Lutz. *Fahmii v. Lutz,* no. 99-27734 (Philadelphia County).

(29) Trial on Ms. Fahmii's complaint for child support was scheduled for February 23, 2000.

(30) By letter to Tereas [sic] Wines, Hearing Office, Family Court, dated February 18, 2000, respondent requested a continuance because he was attached for trial on another matter.

(31) By interim order dated May 5, 2000, Judge Panepinto ordered Mr. Lutz to pay $313 bi-weekly for child support.

(32) On June 27, 2000, a support hearing was held before Bernadette Valderrama, Esquire, master in custody/support.

(a) Mr. Lutz offered evidence that he had been paying $963 per month in support and educational expenses between October 27, 1999, and May 4, 2000; and

(b) The parties agreed that the effective date of the support order would be May 4, 2000.

(33) In a report dated August 21, 2000, Ms. Valderrama recommended that Mr. Lutz pay $316.14 bi-weekly for the support of his son, retroactive to October 27, 1999.

(34) In an undated letter to respondent, Mr. Lutz advised respondent of his objections to the recommended order, including the failure to credit him with $963 per

month that he had paid directly to Ms. Fahmii during part of the retroactive period.

(35) On August 21, 2000, Ms. Valderrama and Judge Panepinto signed a proposed order of support that:

(a) ordered Mr. Lutz to pay $316.14 bi-weekly for support of his son, effective October 27, 1999;

(b) recommended that Mr. Lutz pay $10 bi-weekly on arrears;

(c) did not credit Mr. Lutz with the direct payments he had made to Ms. Fahmii; and

(d) instructed the parties to file exceptions by September 1, 2000, or the proposed order would become final.

(36) Ms. Ana Burgos of the clerk's office sent respondent instructions for filing exceptions in support cases. The instructions stated, in pertinent part, that any party who intends to rely on notes of testimony at the hearing on exceptions may order the notes *"in writing"* from the clerk of court or by coming *"in person"* to the clerk of court's office. (emphasis in original)

(37) On August 30, 2000, respondent filed exceptions to the master's report, in which respondent argued that the master erred in:

(a) determining October 27, 1999, as the effective date of the support order because it was agreed the effective date of support would be May 4, 2000, and the master's determination resulted in Mr. Lutz not being credited with $963 a month that he had paid from October through May;

(b) concluding Ms. Fahmii's potential income was only $26,000; and

(c) ordering a wage attachment, because Mr. Lutz had made timely payments.

(38) Respondent failed to order the notes of testimony of the June 27, 2000 support hearing either in writing or in person, as instructed. The notes of testimony were necessary to establish the grounds for respondent's exceptions to the master's report.

(39) When Mr. Lutz inquired about the progress of the appeal from the master's report, respondent advised Mr. Lutz that he was having trouble securing the notes of testimony.

(40) Mr. Lutz received a Notice of intent to suspend, nonrenew, or deny driver's license for failure to pay support, dated October 6, 2000, from the Enforcement Division of Family Court.

(a) The notice provided that an order to suspend, nonrenew, or deny Mr. Lutz driver's license would be issued to the Pennsylvania Department of Transportation within 30 days.

(b) The notice provided that Mr. Lutz could contest the adverse action on his driver's license on or before November 5, 2000.

(41) Mr. Lutz received a notice of credit bureau reporting dated October 6, 2000, from the Enforcement Division of Family Court.

(a) The notice stated that the court would report Mr. Lutz' delinquent child support payments to consumer credit bureaus.

(b) The notice provided that Mr. Lutz had 20 days to contest the accuracy of the arrearage information.

(42) By order dated October 12, 2000, the Honorable Joyce Mozenter:

(a) denied exceptions filed by Ms. Fahmii;

(b) denied exceptions filed by Mr. Lutz because no transcript was provided to establish a record of the grounds for the exceptions; and

(c) made final the interim order of June 27, 2000.

(43) By letter dated October 16, 2000, Mr. Lutz wrote to respondent enclosing the Notice of Credit Bureau reporting and Notice of intent to suspend, nonrenew, or deny driver's license, and requesting respondent:

(a) to contest, by October 26, 2000, the Notice of Credit Bureau reporting regarding the accuracy of the arrears;

(b) to contest, by November 5, 2000, the Notice of intent to suspend, nonrenew, or deny driver's license;

(c) to seek modification of the interim custody arrangements; and

(d) to petition Ms. Valderrama to modify her order.

(44) By letter dated October 24, 2000, respondent wrote to the Tactical Enforcement Unit of Family Court and requested that they delay action on both of the notices received by Mr. Lutz until after an October 31, 2000 hearing.

(45) By letter dated October 31, 2000, the Domestic Relations Division notified Mr. Lutz that his child support arrearage would be subject to collection by the Federal Tax Refund Offset Program and/or administrative

offset. The notice provided that the determination could be contested within 30 days of the date of the notice.

(46) By notice dated November 10, 2000, the Enforcement Division of Family Court notified Mr. Lutz that they would report his child support arrearage to consumer credit bureaus unless he contested the accuracy of the information within 20 days.

(47) Mr. Lutz brought the November 10, 2000 notice to respondent's attention.

(48) By letter to Judge Zaleski, dated April 16, 2001, respondent:

(a) stated that he was contesting Mr. Lutz' alleged overdue child support;

(b) advised that he would be filing a petition to determine the status of Mr. Lutz' alleged overdue child support;

(c) requested the matter not be referred to the State Tax Refund Offset Program (STROP) Unit; and

(d) requested an administrative review with the Domestic Relations Section.

(49) Respondent failed to file a petition on behalf of Mr. Lutz to determine the status of his child support payments. Respondent testified, however, that he personally visited the Family Court, where a Mr. Pandolfi placed a hold on further action in his computer.

(50) By notice of decision dated May 1, 2001, the Domestic Relations Section notified Mr. Lutz of the dismissal of his objections to the proposed action to submit his federal tax refund for interception for payment of support arrearages in the amount of $4,623.

(51) By letter dated June 15, 2001, the Domestic Relations Division notified Mr. Lutz that his income tax refund, in the amount of $4,031, had been intercepted to be applied to the arrears owing on his child support.

(52) By letter dated September 4, 2001, Mr. Lutz advised respondent that he retained Paul Pollack, Esquire, to handle his child custody and support matters.

(53) By letter to respondent, dated September 7, 2001, Mr. Pollack:

(a) informed respondent that he had been retained to represent Mr. Lutz in his custody and support matters; and

(b) requested respondent to forward Mr. Lutz' file to him.

(54) By certified letter from Mr. Lutz to respondent, dated February 4, 2002, Mr. Lutz:

(a) advised respondent that hearings were scheduled in Mr. Lutz' support and custody matters, and one issue which had arisen was the delay in proceeding in these matters; and

(b) requested that respondent provide, by the end of February 2002, a synopsis of his efforts in the custody and child support matters.

(55) By certified letter to respondent dated February 19, 2002, received by respondent on February 20, 2003, Mr. Lutz:

(a) stated that he retained respondent in 1999 for a fee of $7,500;

(b) complained that respondent never filed for a custody hearing and failed to provide legal protection in the support matter;

(c) requested the return of the fee within 30 days; and

(d) requested an accounting for any portion of the fee respondent claims he earned.

(56) Respondent did not respond to Mr. Lutz' letters.

## Charge II: The LaBon Matter

(57) In April 2001, Gary LaBon, who was imprisoned at the State Correctional Institution at Rockville, contacted respondent concerning representation in a Post Conviction Relief Act (PCRA) proceeding, in which he had filed a pro se petition; advised respondent of the facts of the case and the issues which he felt should be investigated and raised; and asked if respondent would represent him and what the fee would be.

(58) By letter dated April 27, 2001, respondent advised Gary LaBon that he would represent him for a fee of $5,000.

(59) Gary LaBon's father, DeVaughn LaBon, a resident of California, spoke to respondent concerning the PCRA matter and informed respondent that he had only $3,500 at the time, but would pay the remaining $1,500 as soon as possible.

(60) Respondent agreed to represent Gary LaBon by reviewing the matter and contacting Gary LaBon.

(61) On June 28, 2001, DeVaughn LaBon sent respondent five money orders in the amount of $700 each, which respondent received on July 2, 2001.

(62) Respondent negotiated the money orders. Respondent placed the funds in his attorney operating account and used it to pay operating bills and expenses.

(63) By certified letter dated August 1, 2001, which was received by respondent on August 22, 2001, Gary LaBon advised respondent where to obtain information concerning the alleged victim in his case and asked respondent to provide a copy of his file.

(64) By letter dated August 23, 2001, respondent:

(a) informed Gary LeBon that he had requested all of his records concerning the case;

(b) stated that he would amend the PCRA petition as soon as he received the records; and

(c) asked that Gary LaBon contact him with any other information relating to the petition that he wanted respondent to review.

(65) Respondent received Gary LaBon's letter of August 23, 2001.

(66) Respondent took no further action in the matter.

(67) By certified letter sent in September 2001, Gary LaBon asked that respondent contact him to discuss his case. Respondent received Gary LaBon's September 2001 letter.

(68) By certified letter dated October 15, 2001, which was received by respondent on October 18, 2001, Gary LaBon asked respondent to respond to his inquiries about his case and to arrange to speak to him by telephone.

(69) In November 2001, DeVaughn LaBon called and sent two faxes to respondent requesting a refund of the

fee due to non-performance of services on his son's case. Respondent received the faxes on November 7, 2001.

(70) In a telephone conversation with DeVaughn LaBon, respondent agreed to refund the unearned fee.

(71) By letter dated December 17, 2001, Leland D. Sterling, Esquire, a California attorney, wrote to respondent on behalf of the LaBons and asked for a refund of the unearned fee, plus interest. Respondent received the letter.

(72) By certified letter dated February 12, 2002, which was received by respondent on February 14, 2002, Gary LaBon requested that respondent perform the agreed-upon legal services or return his father's money.

(73) By letter dated February 27, 2002, respondent:

(a) requested that Gary LaBon provide a copy of the PCRA petition;

(b) stated that he had contacted the courthouse in Wilkes-Barre and requested copies of Gary LaBon's record; and

(c) asked whether Gary LaBon desired respondent's continued representation.

(74) By certified letter dated March 3, 2002, which was received by respondent on March 5, 2001, Gary LaBon informed respondent of the location of the PCRA petition and the availability of information concerning his case on-line; again asked that respondent investigate matters involving the alleged victim and then amend the PCRA petition; and asked that if respondent did not intend to proceed on his behalf, to refund the fee to his father.

(75) Respondent failed to take any action on behalf of Gary LaBon.

(76) By certified letter dated April 12, 2002, which was received by respondent on April 23, 2002, Gary LaBon asked respondent to refund the $3,500 plus interest.

(77) Respondent refunded the $3,500 to DeVaughn LaBon in late July 2002.

## Charge III: The Gamble Matter

(78) On or about April 6, 2000, Henry L. Gamble consulted respondent with respect to representation in a petition to correct implementation of his divorce decree relating to division of his pension.

(79) Respondent agreed to represent Mr. Gamble for a fee of $1,000.

(80) Mr. Gamble gave respondent a $1,000 check for his legal services. Respondent placed the $1,000 check into his operating account.

(81) Thereafter, respondent delayed in taking any action on behalf of Mr. Gamble.

(82) From time to time, Mr. Gamble or his current wife called respondent to inquire as to the status of the matter.

(a) On two occasions, respondent returned calls at times at which the Gambles were not available.

(b) On other occasions, respondent apologized to the Gambles about the delay, told them about other cases that he was working on, and stated that everything was going well with Mr. Gamble's case.

(83) Respondent's statements to the Gambles that Mr. Gamble's case was progressing satisfactorily were misleading, in that respondent had taken no action whatsoever on Mr. Gamble's case.

(84) In October 2001, Mrs. Gamble called respondent to obtain the status of Mr. Gamble's case.

(a) Respondent told Mrs. Gamble that the case was to be heard in December 2001, that it was not necessary that Mr. Gamble attend the hearing, and that he would call them back.

(b) Respondent's statements to Mrs. Gamble that the case was scheduled for December 2001 were false and misleading, in that respondent had taken no action whatever on the case, and no hearing was scheduled.

(85) Thereafter, respondent failed to communicate with the Gambles or respond to their reasonable requests for information concerning Mr. Gamble's case.

(86) In January 2002, Mrs. Gamble called respondent to inquire as to the outcome of the December 2001 hearing.

(a) Respondent told Mrs. Gamble that the case was to be heard in March 2002, he needed to talk to Mr. Gamble's divorce attorney, and Mr. Gamble's divorce attorney was needed for the March hearing but was ill.

(b) Respondent's statement to Mrs. Gamble that the case was scheduled for March 2002 was false, in that no hearing was scheduled.

(87) In March 2002, Mrs. Gamble called respondent to inquire as to the outcome of the March hearing.

(a) Respondent told Mrs. Gamble that the matter was re-scheduled for May 2002.

(b) Respondent's statement to Mrs. Gamble that the case was scheduled for May 2002 was false, in that no hearing was scheduled.

(88) By certified letter dated July 15, 2002, Mr. Gamble asked that respondent refund the unearned fee.

(89) Respondent received Mr. Gamble's certified letter on July 17, 2002.

(90) Respondent refunded the unearned fee on August 30, 2002.

(91) Mr. Gamble suffered financial hardship as a result of respondent's failure to petition to correct the divorce decree.

### Charge IV: The Weiser Matter

(92) In or about July 2000, David Weiser retained respondent to represent him in divorce, custody, support, and equitable distribution proceedings.

(93) Respondent informed Mr. Weiser that the fee for his representation would be a flat fee of $3,500.

(94) Respondent had not previously represented Mr. Weiser.

(95) By letter dated July 26, 2000, respondent purported to confirm his fee agreement with Mr. Weiser, stating that the fee "would be in the range of $3,500 to $5,000. . . . I do not charge on an hourly basis but charge on 'flat fee' arrangement. However, should any extraordinary [sic] circumstances arise regarding this case, then we would sit down and discuss any additional legal fees,

if necessary, over and above the maximum quoted fee of $5,000." (Stip. ¶178.)

(96) The July 26, 2000 letter did not advise Mr. Weiser of the services included in the $3,500 to $5,000 fee, or how the fee would be determined within that range.

(97) On July 26, 2000, Mr. Weiser paid respondent $3,500 in cash.

(98) Respondent failed to enter his appearance on behalf of Mr. Weiser.

(99) During the course of the representation, Mr. Weiser removed financial records from the marital home in which his wife was residing.

(100) By letters dated September 27 and October 11, 2000, Ms. Betty Lawler, the attorney for Mr. Weiser's wife, asked respondent to direct Mr. Weiser to return the records that Mr. Weiser had removed.

(101) By letter dated November 17, 2000, Ms. Lawler:

(a) reminded respondent that he had not entered his appearance or filed an acceptance of service; and

(b) again asked respondent to have Mr. Weiser return the documents to Mrs. Weiser.

(102) Respondent received the November 17, 2000 letter.

(103) By letter dated January 19, 2001, Ms. Lawler advised respondent that if the documents were not returned within seven days, she would file a petition for special relief including return of the documents and payment of her counsel fees.

(104) Thereafter, respondent advised Mr. Weiser to make copies of 1988-1999 tax returns and provide them to his wife.

(105) Respondent failed to provide a written response to Ms. Lawler's correspondence.

(106) On or about February 20, 2001, Ms. Lawler filed a petition for special relief demanding return of the documents that Mr. Weiser removed from the marital residence.

(107) Respondent failed to formally respond to the petition for special relief.

(108) By letter dated March 13, 2001, respondent requested that Ms. Lawler itemize the records she was requesting.

(109) By letter dated March 27, 2001, respondent advised Ms. Lawler that he believed that Mr. Weiser had provided the records.

(110) By order dated May 1, 2001, the court ordered Mr. Weiser to:

(a) return all documents, file cabinets and boxes taken from the marital home; and

(b) pay Ms. Lawler $750 in counsel fees by June 1, 2001, and if he failed to pay by June 1, 2001, the funds would be deducted from his share of equitable distribution.

(111) By letter dated June 19, 2001, respondent advised Mr. Weiser: "Pursuant to our many conversations, this letter will serve to confirm that any prior court ordered payments of attorney's fees to Betty Lawler will be assumed by me." (Stip. ¶200.)

(112) Respondent paid $500 to Ms. Lawler.

(113) By letters dated May 1 and June 10, 2002, Mr. Weiser reminded respondent that $250 of the fee to Ms. Lawler was still outstanding.

(114) Respondent received the letters.

(115) By letter dated January 8, 2003, Mr. Weiser:

(a) informed respondent that Mr. Weiser was obligated to pay the $250 at equitable distribution;

(b) asked respondent to reimburse the $250 directly to him; and

(c) requested that respondent refund the unearned portion of the fee.

(116) Respondent did not account for the fee paid by Mr. Weiser.

(117) Respondent failed to promptly reimburse Mr. Weiser the $250.

(118) Petitioner presented 17 exhibits at the hearing. (P-65 through P-81.) Each exhibit was a separate lawsuit wherein respondent was a named defendant. The time period of the lawsuits ranged from an August 29, 1997 lien of the Pennsylvania Department of Revenue to a Certification of Default of Settlement filed on April 8, 2004, one week before the disciplinary hearing.

(119) In these 17 lawsuits, respondent was sued for unpaid taxes, legal malpractice, breach of contract, failing to pay for services rendered, confession of judgment for office rent, medical professional fees owed, and failing to report his legal secretary's earnings to the federal

government. Default judgments were entered against respondent in four of the cases. (P-67, 68, 69, and 77.) There were a total of five tax liens, including two unsatisfied liens to the Internal Revenue Service in which respondent owes over $15,000. (P-71, P-75.) In addition, there were open judgments, totaling over $40,000, for money owed for doctor's fees (P-78), rent (P-81), and books (P-77).

(120) During the time frame of the misconduct, respondent's marriage was in the process of deteriorating.

(121) In April 1997, respondent was diagnosed with Crohn's Disease, an illness involving the inflammation of the stomach lining, causing respondent to experience chronic fatigue and serious irregularities with his stomach and intestinal tract.

(122) During the period at issue, respondent was the sole caretaker for his elderly mother and was often consumed with responsibilities for her physical and financial well-being.

(123) Respondent was candid and truthful in his testimony before the Hearing Committee.

(124) Respondent expressed appropriate remorse for his misconduct and accepted full responsibility.

(125) Respondent presented the testimony of six character witnesses, all of whom are Pennsylvania-licensed attorneys.

(126) These witnesses offered credible testimony of respondent's good reputation in the community for being a truthful, honest and law-abiding person.

## III. CONCLUSIONS OF LAW

By his conduct as set forth above, respondent violated the following Rules of Professional Conduct:

(1) R.P.C. 1.1—A lawyer shall provide competent representation to a client.

(2) R.P.C. 1.3—A lawyer shall act with reasonable diligence and promptness in representing a client.

(3) R.P.C. 1.4(a)—A lawyer shall keep a client informed about the status of a matter and promptly comply with reasonable requests for information.

(4) R.P.C. 1.4(b)—A lawyer shall explain a matter to the extent necessary to permit the client to make informed decisions regarding the representation.

(5) R.P.C. 1.5(b)—When a lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, in writing, before or within a reasonable time after commencing the representation.

(6) R.P.C. 1.16(d)—Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned.

(7) R.P.C. 3.2—A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.

(8) R.P.C. 8.4(c)—It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

(9) R.P.C. 8.4(d)—It is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

## IV. DISCUSSION

This matter is before the board on a petition for discipline charging respondent with ethical misconduct in four separate client matters.

Respondent's admissions, the joint stipulation of fact and law, and the clear and convincing evidence put forth by petitioner, establish that respondent violated the Rules of Professional Conduct as charged in the petition for discipline. Three of the clients retained respondent to represent them in domestic relations cases and the fourth client retained respondent to assist him in a post-conviction criminal proceeding. In all four matters, respondent failed to act diligently and neglected to communicate with his clients. Respondent failed to provide proper representation, and failed to tell clients that he had not obtained dates for hearings or notes of testimony. In two of the matters, respondent misrepresented the status of the case and the work he had done.

The only issue in this case is the appropriate measure of discipline to meet the disciplinary system's goals. In determining the sanction in any disciplinary matter, the Disciplinary Board examines precedent for the purpose of measuring the respondent's conduct against other similar transgressions. *In re Anonymous No. 56 D.B. 1994,* 28 D.&C.4th 398 (1995). The board will also consider any aggravating and mitigating factors presented. *In re Anonymous No. 35 D.B. 1988,* 8 D.&C.4th 344 (1990).

In cases involving serial neglect of client matters, such as those presented here, the Pennsylvania Supreme Court routinely imposes suspensions of at least one year and one day, the minimum period of suspension necessary to trigger the requirement of a reinstatement hearing.

In *Office of Disciplinary Counsel v. Bolno, No. 162 D.B. 2000,* 812 Disciplinary Docket no. 3 (Pa. March 7, 2003), Ms. Bolno engaged in a pattern of conduct similar to that of the instant respondent. During a span of seven years involving four client matters, Ms. Bolno failed to diligently and competently represent clients, failed to communicate with clients and opposing counsel, and misrepresented the status of matters to clients. Ms. Bolno also made a misrepresentation on her New Jersey attorney registration form that she was "inactive," when in fact she was suspended. The Hearing Committee recommended a six-month suspension. Citing *In re Anonymous No. 73 D.B. 1999,* No. 685 Disciplinary Docket no. 3 (Pa. April 2, 2001), and *In re Anonymous No. 91 D.B. 1990,* 14 D.&C.4th 597 (1992), the Disciplinary Board found that recent cases involving a pattern of neglect and misrepresentation have resulted in suspensions of one year and one day. The Disciplinary Board concluded that a suspension of this duration effectively serves to protect the public and to reflect the gravity of the misconduct in which respondent engaged. Upon consideration of the Disciplinary Board report, the Supreme Court deviated from the board's recommendation and imposed a greater suspension of two years.

The Supreme Court also increased the Disciplinary Board's recommendation of discipline in *In re Anonymous No. 142 D.B. 1999,* 60 D.&C.4th 522 (2001). In

that case, the respondent neglected only three legal matters and made only one misrepresentation as to the status of a case during a four-year period. Like the instant respondent, the attorney stipulated to all the factual allegations and to violations of the Rules of Professional Conduct. But unlike respondent, the attorney undertook significant and specific steps to improve the administration of his office. This attorney had previously received three informal admonitions. Recognizing that each disciplinary case is unique, the board found that where "neglect of client matters is not an isolated instance but impacts numerous clients and involves some element of misrepresentation, the required discipline is generally a suspension." *Id.* at p. 540. The Disciplinary Board recommended that the respondent be suspended for a period of six months. The Supreme Court imposed a suspension of one year and one day. *Id.* at p. 541. One month prior to its decision in *No. 142 D.B. 1999,* the Supreme Court imposed a suspension of one year and one day upon a respondent who engaged in neglectful and incompetent conduct in eight bankruptcy matters over a two-year period. *Office of Disciplinary Counsel v. Levande,* No. 658 Disciplinary Docket no. 3, (Pa. April 2, 2001). The board noted that Mr. Levande's conduct did not last as long as another attorney who was suspended for two years for neglecting 11 cases over five years. *Id.* at p. 33, citing *In re Anonymous Nos. 52, 79 & 116 D.B. 92 and 30 D.B. 93,* 24 D.&C.4th 447 (1994). Mr. Levande also failed to properly maintain financial records and handle client funds. Although Mr. Levande had received two prior informal admonitions, there was no finding of intentional misrepresentation.

The case of *In re Anonymous No. 91 D.B. 1990,* 14 D.&C.4th 597 (1992), presented the converse fact pattern as *Levande.* Therein, the respondent had no history of discipline but made misrepresentations to clients in two cases he neglected. The respondent also altered an existing document. The board recommended a suspension of a year and one day, reasoning that "a suspension may be the appropriate sanction for cases of neglect and misrepresentation even . . . where no prior discipline has been administered. . . ." *Id.* at p. 608. The Supreme Court adopted the board's recommendation.

Similarly, in *In re Anonymous No. 121 D.B. 1994,* No. 281 Disciplinary Docket no. 3, (Pa. Dec. 30, 1996) the respondent had no record of discipline. He neglected four legal matters during a one and a half year period. Although the respondent made statements to clients that led them to believe that he was taking action on their case, the board did not find that he gave any patently false status reports. The board recommended a two-year suspension, and the Supreme Court adopted that recommendation.

The foregoing cases highlight the relevant factors the Supreme Court considers in determining the appropriate discipline. These factors include the number of legal matters neglected; length of time over which the neglect occurred; and presence or absence of misrepresentation, and the attorney's prior disciplinary history.

In the instant matter respondent neglected four client matters during a four-year time frame, and made misrepresentations to two clients. In the Lutz matter, respondent appeared to take ineffectual shortcuts in his efforts to handle his client's custody case. Respondent did not

follow appropriate procedures as required by the court. In the LeBon matter respondent failed to take action on behalf of his client, who was incarcerated in a distant location at the time. Respondent did refund the monies paid by the client. Respondent's actions in the Gamble matter are serious, as he essentially did nothing on behalf of his client, but misled him as to the status of the case by fabricating accounts of hearings that supposedly were to occur, but did not for the reason they were never scheduled. The Weiser matter is another attempt by respondent to take shortcuts rather than the proper steps to accomplish his client's goals.

Petitioner presented 17 joint stipulations as aggravating factors. Each stipulation represented a separate civil action in which respondent was a defendant, ranging from 1997 until the present. The civil actions involve respondent being sued for activities both as an attorney and as a private individual.

Examination of the docket entries reveals that there were four default judgments, sanctions imposed on respondent, and a preliminary injunction entered against respondent for failing to report his secretary's taxes to the federal government. Of the 17 lawsuits, there were five tax liens, three from the Pennsylvania Department of Revenue and two from the Internal Revenue Service. The Department of Revenue judgments were satisfied in January 2004, while the IRS liens are still open. In two matters where the docket reflects open judgments, respondent showed that he satisfied the judgments. In three other matters, there are open judgments for money owed to doctors for professional services, to respondent's landlord for rent, and to a publishing company for books. The board does not find that

these civil actions should be held against respondent in his disciplinary proceedings.

Mitigating factors are respondent's lack of prior discipline, cooperation with the investigation, and expression of remorse. Respondent was under domestic and physical duress during the relevant time period, although such personal problems do not rise to the level of *Braun* mitigation. *Office of Disciplinary Counsel v. Braun,* 520 Pa. 157, 553 A.2d 894 (1989). Finally, respondent presented the character testimony of six members of the bar who have known him for years, and who know his reputation in the community as a person who is truthful, honest and law-abiding.

Discipline must reflect the primary interests of the disciplinary system to protect the public and maintain the integrity of the legal profession. Following a thoughtful analysis of the facts of this matter, the Hearing Committee recommended a suspension of one year with a practice monitor. The board is not convinced that a practice monitor is appropriate under these particular circumstances. Respondent's misconduct involved, among other things, misrepresentations to clients. This is not the kind of practice problem that a monitor can deter. Additionally, respondent appeared to be fully aware of the correct steps to take in pursuing his cases, but chose to take shortcuts or try alternative procedures. Respondent believes that his practice problems resulted from his marital difficulties and other personal problems, which he has taken steps to address.

In considering the totality of the circumstances and following the guidance of prior similar cases, the board

recommends that respondent be suspended for one year and one day. Respondent's acts of neglect, lack of communication and misrepresentation in four separate matters indicates that he is unfit to practice law at this time. A suspension of one year and one day requires that respondent file a reinstatement petition and prove his fitness to practice law.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the respondent, Howard Goldman, be suspended from the practice of law for a period of one year and one day.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Member Gentile dissented and would recommend a one-year suspension.

Board Member Suh dissented and would recommend a two-year suspension.

Board Member Curran did not participate in the matter.

Board Members McLaughlin, Brown, Pietragallo and Nordenberg did not participate in the March 16, 2005 adjudication.

## ORDER

And now, August 30, 2005, upon consideration of the report and recommendations of the Disciplinary Board dated May 20, 2005, the petition for review and

response thereto, it is hereby ordered that Howard Goldman be and he is suspended from the bar of this Commonwealth for a period of one year and one day, and he shall comply with all the provisions of Rule 217 Pa.R.D.E.

It is further ordered that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.